UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RAMAAN TERANCE HAND, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| TRADER JOE'S EAST, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**<u>INJUNCTIVE RELIEF REQUESTED</u>**

NOW COMES the Plaintiff, Ramaan Terance Hand, by and through undersigned counsel, and complains against the Defendant, Trader Joe's East, Inc. ("Defendant" or "Trader Joe's"), as follows:

<u>INTRODUCTION</u>

1. This action arises under Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e et seq.) ("Title VII"); 42 U.S.C. § 1981 ("§ 1981"); and the Maine Human Rights Act (5 M.R.S.A. § 4551 et seq.) ("MHRA").

<u>PARTIES</u>

2. Mr. Hand is a United States citizen residing in Portland, Maine.

3. Trader Joe's is a company with its principal place of business in Monrovia, California, that operates a chain of grocery stores throughout the United States. It has a store in Portland, Maine, where Mr. Hand worked.

<u>JURY TRIAL DEMAND</u>

4. Plaintiff requests a trial by jury on all issues triable to a jury.

1

JURISDICTION

5.    Trader Joe's had 500 or more employees for each working day in each of 20 or more calendar weeks in 2019.

6.    The amount in controversy in this matter exceeds $75,000.

7.    This Court has subject matter jurisdiction over Mr. Hand's federal and state claims under 28 U.S.C. §§ 1331, 1332, and 1367.

8.    On or about July 19, 2019, Mr. Hand filed a timely Charge of Discrimination against Trader Joe's with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

9.    On April 6, 2020, the EEOC and MHRC issued Right to Sue Notices with respect to Mr. Hand's Title VII and MHRA claims.

10.   Mr. Hand has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

FACTUAL ALLEGATIONS

11.   Mr. Hand is African American.

12.   Trader Joe's hired Mr. Hand in December 2007.

13.   Mr. Hand worked at three different stores in New York and Boston before he was transferred to the Portland, Maine store (#519) in February 2011.

14.   Trader Joe's currently uses the following job titles for its grocery store employees.

   a.   "Crew" members work the cash registers, receive and unload deliveries, stock shelves, build displays, clean the floor, answer questions about Trader Joe's products, and perform other duties.

2

b. "Merchants" are exclusively promoted from top performing crew members. They set an example for crew members performing all tasks.

c. "Mates" are store leaders, comparable to assistant managers, who are promoted from internal candidates who excel in their roles as well as qualified external candidates. Mates work alongside the crew and Merchants and provide them with direction and training.

d. "Captains" are store managers who are exclusively promoted from Mates.

15. At all relevant times, Gayle "Libbi" Pamphrey served as the Captain at the Portland store.

16. Mr. Hand was promoted to Merchant in about 2012.

17. It soon became clear, after his promotion to Merchant, that Mr. Hand deserved to be a Mate and he was promoted to that position.

18. Mr. Hand was one of the first Merchants in the region to be promoted to Mate.

19. With the exception of a period of time during the last year that Mr. Hand worked at the Portland, Maine, store, Mr. Hand was the only black Mate in that store.

20. Mr. Hand transferred to the Portsmouth, New Hampshire, store (#520) in 2015 and then back to the Portland, Maine, store (#519) in about March 2016.

21. Throughout Mr. Hand's employment, he consistently received favorable performance reviews and, at times, was told that he was the best Mate in the stores where he worked.

22. Mr. Hand was treated differently and less favorably as a manager because of his race.

3

23. The nature of his position often required him to discipline crew members, most of whom were white.

24. White managers rarely had to deal with resistance to discipline from crew members, even when the managers were angry and unprofessional in their methods.

25. When Mr. Hand disciplined crew members, there was sometimes major resistance and retaliation in the form of negative feedback.

26. For example, crew members complained that Mr. Hand did not physically work enough of the product in the store. This was not a requirement of Mr. Hand's position and there were a number of white managers who physically worked the same amount of product as Mr. Hand without negative feedback from the crew.

27. The racism implicit in the complaint by white employees that a black manager does not physically work hard enough should be clear.  The notion that black men are naturally lazy ("Sambo") is one of the most enduring racial stereotypes.

28. Mr. Hand tried to communicate to Ms. Pamphrey that there was an unfair discrepancy between the way the crew treated him as the only black manager compared to how they treated white managers.

29. Mr. Hand sent Ms. Pamphrey a link to an article explaining the impact of unconscious racial bias.

30. While Ms. Pamphrey expressed a desire to discuss the topic further, she never followed up on this.

31. Instead, she placed the onus on Mr. Hand to work more product to appease the crew.

4

32.     This is a common response when a person of color raises the issue of racial disparities. The onus is placed on the victim to adapt his behavior, instead of the other way around.

33.     Unfortunately, Ms. Pamphrey never recognized the implicit racial bias people had against Mr. Hand.

34.     Trader Joe's crew and management receive little to no training on implicit racial bias and how it affects the workplace.  During Mr. Hand's entire time working for Trader Joe's, implicit racial bias was discussed only once for five minutes during a four or five-hour long training.

35.     Recognizing that Ms. Pamphrey had no frame of reference or training to even begin to have a conversation with him about how racism and implicit bias affect dynamics in the workplace, Mr. Hand did not continue to pursue the issue with her.

36.     Trader Joe's terminated Mr. Hand on March 1, 2019.

37.     The stated reason for Mr. Hand's termination was that Trader Joe's lost confidence in his professionalism due to his relationship with Ms. V[1], a white female crew member, and because Mr. Hand socialized with other crew members.

38.     In a written submission to the MHRC, Trader Joe's gave the following new and different reasons for Mr. Hand's termination: (1) Mr. Hand was, in fact, having a romantic relationship with Ms. V in violation of policy; (2) if not, Mr. Hand appeared to be having a romantic relationship with Ms. V in which case he lacked the integrity and professionalism required for a management position; and (3) Mr.

_____

[1] Trader Joe's referred to Ms. V as "Crewmember 1" in its submission to the MHRC.

Hand did not commit to changing the nature of his relationship with Ms. V or how his relationship appeared to others.

39.   In fact, Mr. Hand was disciplined for conduct that white managers were not punished for and fired because of his race and his objection to being treated differently than white managers.

40.   In 2015, Mr. Hand approached Ms. Pamphrey and disclosed that he was becoming close with a crew member (Ms. V) and wanted to figure out a logistical way to pursue a romantic relationship.  Mr. Hand suggested a transfer to store #520 in Portsmouth, New Hampshire.

41.   Ms. Pamphrey thought the timing of the transfer was not right and cautioned Mr. Hand against starting a romantic relationship, so, he did not start a romantic relationship with Ms. V at that time.

42.   Mr. Hand approached Ms. Pamphrey again a month later and she still felt the same way.

43.   At that time Ms. Pamphrey started hearing rumors that Mr. Hand had begun a dating relationship with Ms. V. To avoid any appearance of impropriety, Ms. V quit her job at Trader Joe's so that she and Mr. Hand could pursue a romantic relationship. This was all 100% in compliance with Trader Joe's policy which reads:  "Captains and Mates are not allowed to date or have physical relationships with crew members working in the stores in which they are assigned. If there is a mutual interest in developing a personal relationship, the Captain or Mate must report the interest to his/her supervisor or Regional Vice President before acting upon the interest. The Regional Vice President will then arrange for a transfer

based on business needs. If the Captain or Mate fails to notify his/her supervisor or Regional Vice President before acting upon a mutual interest, he or she will be subject to severe disciplinary action, up to and including termination of employment. A Captain or Mate may not work in the same store with a spouse, a domestic partner, an immediate family member, or a person with whom he or she is romantically involved."

44.     Months after Ms. V quit, Ms. Pamphrey told Mr. Hand that he was being transferred to store #520 but gave no reason why.

45.     Transfers during that time were common and Mr. Hand thought nothing more about it than it being a business decision on the part of the company.

46.     Mr. Hand arrived at store #520 the same day as the new store manager Captain Charles Arnold.

47.     Mr. Hand was immediately struck by the lack of professionalism of the management team that was in place at store #520. He shared his observations with Mr. Arnold, and Mr. Arnold agreed.

48.     Some of the Mates at store #520 quickly set about undermining Mr. Arnold and many crew members followed the lead of these Mates and also undermined Mr. Arnold.

49.     Mr. Hand supported Mr. Arnold's efforts to change the toxic culture, which did not make Mr. Hand popular among the Mates determined to undermine Mr. Arnold.

50.   Trader Joe's claims that at store #520 Mates found Mr. Hand to lack integrity and transparency in his leadership. On the contrary, Mr. Hand was attempting to fix the lack of integrity and transparency on the part of those Mates.

51.   For example, using the store's email server, Mr. Hand sent Mr. Arnold an email detailing some of his concerns about Mates' lacking integrity and leadership. One of the Mates, who was white, found Mr. Hand's email, printed it, and disseminated it to the other managers.

52.   Reading someone else's email lacks integrity. Printing it out and sharing it shows lack of judgement and character.

53.   In spite of these clear violations of Trader Joe's values, Mr. Arnold was unable to get the backing of Trader Joe's to punish the individual responsible for printing and disseminating Mr. Hand's email. Mr. Hand's well-intentioned email was characterized as showing that he lacked integrity and transparency in his leadership.

54.   This episode where Mr. Hand's email was printed and disseminated is another example that illustrates that white Trader Joe's managers are allowed to show a lack of integrity at work without being punished; whereas Mr. Hand was held to a different standard of integrity at work, and held accountable to rumors and innuendo about his actions outside of work.

55.   Mr. Hand agrees that it was unsustainable for him to remain at store #520, but not because he lacked integrity. It was because of Trader Joe's refusal to let Mr. Hand hold others accountable for creating a toxic work environment plus the lengthy commute (one hour each way).

8

56.     Despite all of this, Mr. Hand received a stellar yearly review and very high upstream reviews from the crew members of store #520 during his tenure there.

57.     Mr. Hand returned to Portland, Maine, store #519 in early 2016 and intended to transfer to a store in New York City.

58.     In July 2016, about one month before he was scheduled to move, Mr. Hand sent then-Regional VP Chris Maguire an email letting him know that he (Mr. Hand) could not accept the transfer. Mr. Hand explained that he did not feel safe moving to New York City given the heightened racial tensions there after an unarmed black man, Eric Garner, was killed by a police officer in 2014 and subsequent acts of racial violence around the country. In addition, Mr. Hand was dealing with a major health scare with his then-domestic partner.

59.     Trader Joe's had provided Mr. Hand with financial assistance with his anticipated move to New York City, and he used the money to travel and secure a place to live. When Mr. Hand communicated to Mr. Maguire that he would not be transferring to New York, Mr. Hand assumed that Mr. Maguire would communicate that information to anyone who needed to know.

60.     Mr. Maguire went on vacation and did not pass the information along.  Office workers in charge of relocation found out that Mr. Hand was not moving when Mr. Hand cancelled the moving company contract.

61.     Someone from the office called Mr. Hand and said that it is standard practice for the Mate to repay the relocation money. Mr. Hand said that makes sense but he had spent the money in good faith, expecting to move, and wondered if repayment could be waived. The office employee immediately became angry and combative,

asking questions that called Mr. Hand's earlier trip into question like "so when did you take your trip to New York?"

62.    Weeks later, Mr. Maguire personally traveled to Portland to investigate Mr. Hand on the subject. It appears that Mr. Maguire was under a good deal of pressure from someone to get to the bottom of this.

63.    Mr. Maguire wanted Mr. Hand to show him a receipt or some other "proof" that he had been in New York. Mr. Hand provided the proof from bank records and sent another email to Mr. Maguire questioning the need for the investigation.

64.    Mr. Maguire traveled to Portland again, this time to apologize to Mr. Hand for how he had been treated. Mr. Maguire took ownership for not contacting people in the office before taking his vacation.

65.    Mr. Hand agreed to pay back the lump sum (around $2500) in order to put these issues related to his relocation expenses in the past.

66.    It is quite possible that the scrutiny Mr. Hand faced related to the relocation expenses was also implicitly motivated by racial bias.  It is a well known racial stereotype that black men are more likely to engage in criminal or unethical behavior.

67.    As noted above, for a period of time, Mr. Hand had a romantic relationship with Ms. V.

68.    Mr. Hand and Ms. V ended their romantic relationship while Mr. Hand was working in store #520.

69.    Ms. V was rehired at store #519 before Mr. Hand transferred back to that store and she was working there when he returned to store #519.

10

70.   After Mr. Hand transferred back to store #519, Ms. Pamphrey noticed that Ms. V had some difficulty working with Mr. Hand.  Ms. Pamphrey urged Mr. Hand and Ms. V to find a way to develop a healthy working relationship despite any hard feelings that might have been left over from their break up.

71.   Upon the advice of Ms. Pamphrey and also a counselor that he was seeing, Mr. Hand began to communicate with Ms. V in an effort to repair some of the emotional damage caused by their prior relationship.

72.   Mr. Hand's efforts to repair his relationship with Ms. V was done outside of Trader Joe's, not "on the clock."

73.   Mr. Hand and Ms. V never resumed their romantic relationship after Mr. Hand returned to store #519 in 2016.

74.   While Mr. Hand did socialize with Ms. V and other crew members outside of work, he always conducted himself with kindness, dignity, and generosity on and off of the clock.  Mr. Hand's interactions with crew members outside of work did not impact how he treated them at work.

75.   In September 2017, Ms. Pamphrey spoke with Mr. Hand about his relationships with crew outside of work including Ms. V which was allegedly creating "rumors and concerns" among the crew members and Mates about his professionalism.

76.   For example, Ms. Pamphrey asked Mr. Hand about his friendship with crew member Shannon C (white male).

77.   Mr. Hand explained that he and Shannon C have a number of mutual acquaintances in Portland and that they used to cross paths a lot but less so at the

time he was speaking with Ms. Pamphrey. Mr. Hand said he had spent time outside of work with Shannon C no more than two times that year.

78.   MLP (white male, Mate) on the other hand, was best friends with Shannon C. Upon information and belief, MLP was not questioned or reprimanded about his relationship with Shannon C.

79.   Mr. Hand told Ms. Pamphrey that he and Ms. V had a platonic relationship, they were repairing their friendship, and he intended to continue to work in repairing their friendship. He mentioned that he felt guilty that Ms. V had to move into a lesser living situation when they broke up and that she walked to work through a bad part of town. Mr. Hand said that to make amends, he would often pick up Ms. V and drive her to work.

80.   According to Trader Joe's, a Mate named Andy Hedges complained that Mr. Hand was not holding Ms. V accountable to the same level as other crew members.

81.   However, there was no Mate named Andy Hedges employed at the time. There was a Mate named Andy, with a last name that began with the letter H, who blatantly showed favoritism, engaged in sexual harassment, and showed such troubling integrity that Mr. Hand and two other Mates met to decide what action they should take to address it.  (See ¶ 137 below for further information about this.)

82.   Mr. Hand received a written warning due, in part, to his interactions with crew members outside of work not because he did anything wrong but, instead, because of the perception that he might have done something wrong.

12

83.  Perception is an arbitrary thing and highly susceptible to bias. As discussed in more detail below, white managers were not disciplined for conduct that was the same or more problematic than Mr. Hand's.

84.  In connection with the discussions Ms. Pamphrey had with Mr. Hand in September 2017 about his socializing with crew members outside of work, Mr. Hand explained to Ms. Pamphrey that, because of the advice he had received from his counselor, he intended to continue to socialize with Ms. V outside of work.  In response, Ms. Pamphrey said "ok, that is your choice, thank you for your honesty" or words to that effect.

85.  As such, when Ms. Pamphrey issued Mr. Hand the written warning in September 2017, she knew that he would continue to socialize with Ms. V outside of work. Ms. Pamphrey did not tell Mr. Hand that he would be disciplined or terminated if he continued to socialize with Ms. V outside of work.

86.  After he received the written warning, Mr. Hand moved forward with confidence that his leadership and body of work in the store was enough to counter whatever false rumors and negative perceptions were present.

87.  Mr. Hand's next performance evaluation showed that he had the trust of the crew. In August 2018, when Ms. Pamphrey evaluated Mr. Hand's performance, she wrote, "…you excel in [] your ability to create certainty and fairness within the crew" and that Mr. Hand's goal should be to "help your other mates along this same level of awareness."

88.  The August 2018 evaluation also contained feedback from 109 crew members who participated in the store's survey. They rated Mr. Hand's ability in six

13

categories on a scale of one to five. Mr. Hand received the highest rank of "strength" in all six categories including "Values my contribution," "Treats others with respect," and "Treats the crew fairly" with an overall score of 4.35 out of 5. Crew members praised Mr. Hand's singular willingness to reach out to crew members who, for whatever reason, were overlooked or ignored.

89. During a training session with HR that Mr. Hand attended in about October 2018, the policy against certain employees dating was discussed. Employees were told that dating was not encouraged but that if two people "fall in love" they have to make that information known so that steps can be taken to address the relationship, like transferring one of them to another store.

90. During this October 2018 training session, there was also a discussion about how it was not a violation of company policy for Mates to socialize with crew members outside of work but that sometimes such socializing could create problems.

91. Years before this October 2018 training, Mr. Hand had attended another training where a Captain asked a HR representative "why doesn't Trader Joe's just say that Mates can't hang out with crew?"  The HR representative responded that Trader Joe's "frowned on" Mates hanging out with crew members outside of work but Trader Joe's does not have a policy that prohibits employees having social relationships with subordinates.

92. According to Trader Joe's, Ms. Pamphrey did not find it acceptable for Mates to have any level of social relationships with crew but that is not true.  Ms.

Pamphrey tolerated Mates socializing with crew members outside of work and did so herself.

93. According to Trader Joe's, Mr. Hand came under investigation in February 2019 due to four anonymous emails which criticized Mr. Hand's integrity and claimed that he "sleeps with crew members."

94. Based on the information Trader Joe's has provided to date, it is impossible to tell if the four anonymous emails were from different people or from one person, or what might have prompted the person(s) to complain.

95. Ms. Pamphrey was aware around the time of these anonymous complaints that Mr. Hand had needed to counsel a crew member who had exhibited a pattern of inappropriate behavior. This crew member would have had a motive to make false accusations against Mr. Hand.

96. Trader Joe's claims that Ms. Pamphrey followed up on these anonymous emails by speaking with "multiple" crew members asking, generally, if there were any Mates and crew members involved in a romantic relationship.

97. Trader Joe's produced no documents regarding Ms. Pamphrey's alleged investigation into whether any Mates and crew members were involved in a romantic relationship.

98. The purported investigation focused, in part, on Mr. Hand's relationship with Ms. V.

99. Ms. V was interviewed in connection with this investigation and she denied that she was involved in a romantic relationship with Mr. Hand. Ms. V held firm to

this denial despite attempts to pressure her to say that she was involved in a romantic relationship with Mr. Hand.

100. The claim that Mr. Hand flirted with or showed favoritism toward Ms. V is not true.

101. Being a shy and quiet person, Ms. V did communicate with Mr. Hand in a way that she didn't with all of the other managers. But there are at least two other white male managers (Matt D and Matt L) that she communicated with in a similar manner.

102. Ms. V's comfort in engaging Mr. Hand, Matt D, and Matt L in a casual manner says more about the engagement skills of the other managers than it does about Mr. Hand's friendship with her. It also ignores the fact that there are many other crew members who were comfortable with Mr. Hand and engaged him in a similar manner.

103. To suggest that Mr. Hand's behavior at work was inappropriate holds him to a different standard than white managers whose behavior was often much worse. Mr. Hand's conduct was objectively innocuous, but was perceived negatively due to racial bias.

104. On February 23, 2019, Mr. Hand was brought into a meeting with Ms. Pamphrey and the Regional Manager, Shannon Curran, and questioned about accusations that he "plays favorites."  (This meeting is referred to below as the "February 23 meeting.")

105. It is typical during meetings like the February 23 meeting for the Regional Manager to talk and for the Captain to stay silent and write down pertinent information that is said.

106. Mr. Hand found it strange that during the February 23 meeting, Ms. Curran had the pen and paper and did the talking as well, and she only wrote on the pad once or twice.

107. The accusation that Mr. Hand "played favorites" was false and Mr. Hand fully disputed the charge.

108. There were many white managers who were well known for playing favorites and they were not questioned about it or held accountable.

109. Ms. Curran and Ms. Pamphrey did not cite any examples of Mr. Hand allegedly playing favorites or making a decision based on how he personally felt about someone.

110. Mr. Hand's interactions with Ms. V outside of work was also discussed during the February 23 meeting.

111. Mr. Hand denied that he and Ms. V were in a romantic relationship.  As he had done back in September 2017, Mr. Hand acknowledged that he and Ms. V socialized outside of work.

112. Trader Joe's claims that, during the February 23 meeting, Mr. Hand acknowledged that he was specifically advised during the October 2018 training against having any social relationships with any crew members.

113. Trader Joe's claim is false.  No one discussed his social relationships with crew members during the October 2018 training.

17

114.   During the February 23 meeting, Mr. Hand told Ms. Curran that he believed his relationships outside of work had no bearing on how he performed his job while at work.

115.   Ms. Curran asked why Mr. Hand did not inform Ms. Pamphrey that he had a friendship with Ms. V so they could have "stayed in front of this."

116.   Mr. Hand told Ms. Curran that he had informed Ms. Pamphrey of his friendship with Ms. V over a year earlier.

117.   This question from Ms. Curran about why Mr. Hand had not informed Ms. Pamphrey of his friendship with Ms. V shows that, in Ms. Curran's mind, there is a scenario where a Mate can be friends with a crew member and management can "stay out in front of this."

118.   Despite any claim to the contrary, there are Mates working across the country at Trader Joe's who have the type of friendship Mr. Hand had with Ms. V. Negative racial stereotyping led some people to judge Mr. Hand's friendship with Ms. V erroneously and Ms. Curran was quick to go along with that narrative.

119.   Ms. Curran claims that Mr. Hand was unwilling to commit that day to changing his behavior toward Ms. V and did not care about others' perceptions of his behavior.  Trader Joe's claims that was one of the reasons it terminated him.

120.   Ms. Curran's claim that Mr. Hand was unwilling to commit that day to changing his behavior toward Ms. V and did not care about others' perceptions of his behavior is false.

121.   Ms. Curran said to Mr. Hand during the February 23 meeting, "What I hear you saying is that you have no plan to change your behavior."

18

122.  Mr. Hand's direct response to Ms. Curran's statement that he was unwilling to change his behavior was, "that's not what I am saying at all." Mr. Hand specifically said to Ms. Curran that he always conducted himself properly but the fact that she was there, having this conversation with him, was enough to give him concern and reevaluate his priorities. Mr. Hand talked about how much he valued his job and how committed he was to it.

123.  Implicit racial bias likely impacted Ms. Curran's perception of Mr. Hand during the February 23 meeting and, due to that bias, she likely perceived him as more combative and uncompromising than he actually was.

124.  By the time of the February 23 meeting, Mr. Hand's friendship with Ms. V had evolved, as friendships do, and he was not spending much time with Ms. V anymore at that point.

125.  Ms. V did reach out proactively (not at Mr. Hand's request) and told Ms. Pamphrey that she did not think her friendship with Mr. Hand was healthy for her. Ms. Curran took that to mean that Mr. Hand had unprofessionally asked Ms. V to intervene professionally on his behalf which was not true.

126.  After the February 23 meeting, Mr. Hand told Ms. V that he had been asked to meet with Ms. Pamphrey again to explain that they were not in a romantic relationship. He did not ask Ms. V to do or say anything to protect him.

127.  Ms. V responded to Mr. Hand in an email dated February 24, 2019, that confirms that Mr. Hand and Ms. V had not been in a romantic relationship for years; that they had not seen each other often of late; and that Ms. V wanted to stop seeing him altogether because of the rumors and gossip about them.

128.   In the Incident Report used to explain Mr. Hand's termination, Ms. Curran wrote that the issue of Mr. Hand hanging out with crew members had been an ongoing issue for years. She also wrote that it had recently caused the crew to lose faith in his leadership.

129.   While it is true that Mr. Hand spent time with crew members outside of work, there is no credible evidence or concrete examples of this leading to unprofessional or inappropriate behavior on his part on or off the clock.

130.   The crew had not, in fact, lost faith in Mr. Hand's leadership. When a Trader Joe's leader who lacks integrity and professionalism is fired, people rejoice and the crew immediately knows why the person was terminated. That was not the case for Mr. Hand and Trader Joe's knew that his termination would cause a great deal of confusion and consternation among the crew.

131.   In order to mitigate this confusion and consternation, Ms. Pamphrey met with every crewmember in small groups throughout the entirety of the next day to inform the crew that Mr. Hand was no longer there.

132.   As reported back to Mr. Hand, the overwhelming sense during these meetings Ms. Pamphrey had with the crew were that of utter shock and confusion. Some of the earlier groups thought that Mr. Hand had actually passed away. This is not the reaction of a crew that has lost faith in a leader.

133.   While it appears that a very small number, perhaps just a single person, complained about Mr. Hand spending time with crew outside of work, there are far more crew members who rated Mr. Hand favorably based solely on the content of his conduct and performance at work. Mr. Hand's last crew member

review from August 2018, based on the views of 109 crew members, clearly showed this.

134. Trader Joe's has a very relaxed culture and everyone interacts with each other in a familiar way.

135. Trader Joe's does not terminate the employment of white managers who have personal, romantic, or inappropriate relationships with crew members.  Below in paragraphs 136-142 are some examples of this from the Portland store.

136. Ms. Pamphrey (white female, Captain).

   a. Ms. Pamphrey was best friends with crew member Connie S (white female).
      Both of them told Mr. Hand that they were the other's best friend. Their relationship put Ms. Pamphrey in a difficult position trying to manage Connie S. They ended their close friendship about five or six years ago but they both remained employed at Trader Joe's.

   b. About six or seven years ago, Ms. Pamphrey went to the beach to hang out with Jason W (white male), one of the Mates.

   c. Ms. Pamphrey was not terminated because of her relationship with Connie S or her socializing with Jason W and probably was not even disciplined for this conduct.

137. Andy H (white male, Mate)

   a. Andy H spends time outside of work doing athletic events (bike rides, 5k races) with crew member Nadine B (white female).  The entire crew knew about this and asked questions and congratulated them when they saw Andy H and Nadine B at work.  Ms. Pamphrey was around for some of these

21

conversations and it was well known in the store that Andy H and Nadine B engaged in these activities.

b. Andy H developed an unsettling rapport with three different crew members: Amanda B (white female), Leslie H (white female), and Lauren G (Asian female). His tone and demeanor obviously changed to that of excitement when interacting with these three which stood in contrast to his oftentimes prickly nature.

c. When Mr. Hand told Leslie H that someone had said that his interactions with Ms. V were too familiar, her immediate response was "OMG, what about the way Andy talks to me?"

d. Andy H's familiarity with crew members was fodder for the rumor mill especially when he started giving Lauren G rides to and from work. Mr. Hand witnessed Andy H attempt to slyly pass Lauren G a gift (a piece of chocolate he had brought from home) while she was working on a register one day, further proof of the connection they were building outside of work.

e. Former crew member, Lydia M (white female), confided in Mr. Hand that Andy H made her feel uneasy and once made an unprofessional remark about her appearance. (Upon information and belief, Andy H was not disciplined for this.) When Mr. Hand passed this information along to management, Mr. Hand was questioned about his relationship with Lydia M and why she gave him that information, even though she was no longer employed at Trader Joe's at the time. This is an example of how Mr. Hand's perceived

22

improprieties were more of a focus for management than the actual misdeeds of white managers.

f.  Mr. Hand and two other senior Mates discussed how to handle their concerns about Andy H and decided that one of them (Mate Claire B) should bring these issues to Ms. Pamphrey. Ms. Pamphrey's response to their concerns about Andy H's unprofessionalism was this: "Why is Terry hanging out with all of these young women?"

g.  Andy H used a strange phrase while in Mr. Hand's presence. When something came up or he was frustrated, Andy H would say very loudly and very clearly "Son of a Monkey!" Mr. Hand found it odd at first but grew disturbed when Andy H continued to use the phrase in a manner that was loud and clear. When Mr. Hand ignored the phrase, Andy H would always say it again even louder. It seemed like a variation on the term "son of a bitch" or "son of a gun" but the manner, frequency, and situations that he used the term showed that he was purposely using the phrase in Mr. Hand's presence. Andy H was undoubtedly aware that "monkey" is a racist epithet often applied to black people but he nevertheless felt safe using it often in Mr. Hand's presence because the biased culture at Trader Joe's emboldened him to do so. Mr. Hand did not complain about Andy H's pointed use of the term "monkey" because his complaints about other Mates' behavior always led nowhere.

h.  Andy H, white male, behaved inappropriately with impunity and yet he remained employed by Trader Joe's as a Mate throughout Mr. Hand's time at the Portland store.

23

138.   Matt D (white male, Mate)

    a.   Matt D is a twenty plus year veteran with Trader Joe's and is well known to have developed many relationships with crew members over this time.

    b.   Matt D frequently takes trips where he hangs out with crew members that he previously worked with and posts about it on Facebook.

    c.   Matt D's best friend is crew member Joe D (white male). Matt D spends the amount of time with Joe D that you would expect best friends to share. They go to dinners together with Joe D's partner Tara and frequently spend time at each other's houses.

    d.   On two occasions, Mr. Hand saw Joe D and Matt D socializing in public. The first was at a drag show at the now closed club Styxx. The second was in 2019 when a crew member asked some people to attend a going away get together for her at the Corner Room restaurant. There were approximately 10 people present including Matt D, Joe D, Mr. Hand and another Mate, MLP (white male).

    e.   Matt D also had a very close relationship with crew member Kyle T (white male) while he was employed at store #219. Mr. Hand heard Kyle T and Matt D both mention instances when Kyle T spent time over at Matt D's house. Their friendship was so well known to all that (1) Matt D was rarely involved in any disciplining of Kyle T and (2) the management team would ask Matt D about things going on in Kyle T's personal life when Kyle T seemed to be having trouble.  Ms. Pamphrey was involved in conversations about whether,

because of their friendship, Matt D or someone else should speak to Kyle T about various issues.

f.  Both Matt D and Kyle T identify as gay. The only relevance is that Mr. Hand was told that his friendship with Ms. V aroused suspicion because of their "genders" (meaning, a straight man and straight woman who hang out together are perceived to be dating).

g.  Matt D was not terminated or demoted for his relationships and socializing with crew members outside of work.  He probably has never been disciplined for socializing with crew members outside of work either.

139.  MLP (white male, Mate)

a.  MLP frequently hangs out with crew members outside of work yet Mr. Hand never heard any crew member report or complain that this was a concern or problem.

b.  In September of 2017 Mr. Hand was counseled for hanging out with crew members. The day after he was counseled, Mr. Hand saw MLP having brunch with crew member Kayleigh L (white female). Mr. Hand also saw MLP and Kayleigh L together at a show at the Portland House of Music in March 2019.

c.  Like Mr. Hand, if MLP sees crew members outside of work at a bar/restaurant/music venue, he will take time to stop and spend time with them. Mr. Hand saw MLP do this with two white crew members (Josh N and another whose name Mr. Hand does not recall) at the Portland House of Music.

25

d. MLP was best friends with crew member Shannon C (white male).  They had such a close friendship that Shannon C lived with MLP when Shannon C broke up with his girlfriend and did not have a place to stay. While Shannon C was not employed at Trader Joe's at that time, it speaks toward the relationship they had developed while Shannon C was still employed.

e. Ms. Pamphrey was aware of MLP socializing with crew members outside of work.  Notes from conversations she had with employees about Mates socializing with crew members outside of work indicate that she was told MLP was socializing with crew members outside of work.

f. MLP was not terminated or demoted for his relationships and socializing with crew members outside of work.  He probably was not disciplined for this conduct either.

140. Jessica G (white female, Mate)

a. Mr. Hand was at a restaurant, Local 188, when he saw Jessica G enter with then-crew member Amanda B (white female). The two of them seemed nervous and loathe to talk to Mr. Hand. They left shortly after interacting with Mr. Hand.

b. Mr. Hand later confided to someone that it appeared that Jessica G. and Amanda B. were on a date but did not want to make an unfair assumption.

c. Weeks later, Amanda B quit her job at Trader Joe's and she and Jessica G started openly dating. The two of them are currently married.

d. Jessica G was not demoted or terminated for her relationship and socializing with Amanda B.  She probably was not disciplined for this conduct either.

26

141. Ambry L (white female, Mate)

   a. Ambry L was promoted from crew to Mate in 2018.  While Mates are encouraged to end their former friendships with crew members, not all of them do. This was certainly the case with Ambry L.

   b. After her promotion, Ambry L favored crew members she was friends with before her promotion including crew member Hayley (white female).  For example, Ambry L allowed her crew member friends, including Hayley, to spend time in an area in the Portland store reserved only for managers.

   c. Ambry L and Hayely also spend time together outside of work. Both identify as lesbian. (The only relevance is that Mr. Hand was told that his friendship with Ms. V aroused suspicion because of their "genders.")

   d. Ironically, it was Hayley who fueled the rumor mill against Mr. Hand after seeing him and Ms. V having a meal together at a public restaurant.

   e. Ambry L and Hayley were quite open at work about their friendship and the time they spent together outside of work.  It is highly unlikely that Ms. Pamphrey would not have been aware of the fact that they socialized outside of work.

   f. Jessica G has was not demoted or terminated for her relationship and socializing with Hayley outside of work.  She probably was not even disciplined for this conduct.

142. Rebecca T (white female, Mate)

   a. Mr. Hand believes that Rebecca T spends time with crew members outside of work because at least one of them, Danielle D (white female), told Mr. Hand

that Rebecca T suggested that they hang out sometime outside of work;
Danielle D declined the offer.

b. Rebecca T was not demoted or terminated for her relationships and socializing
   with crew members. She probably was not disciplined for this conduct either.

143. Another example of a Mate socializing with a crew member outside of work
     involves a different store from the same region where Mr. Hand worked, the
     Brookline, Massachusetts, store.

a. A white female Mate from the Brookline store, Jenn G, was best friends with
   a white female crew member, Shelly P.

b. Shelly P and Jenn G frequently socialized with each other outside of work.

c. Jenn G was promoted to Captain of a Trader Joe's store even though it was
   well known that Shelly P was her best friend and they spent a lot of time
   socializing with each other outside of work.

144. The above-referenced examples in paragraphs 136-143 prove that Trader Joe's
     stated reason for terminating Mr. Hand – *i.e.*, that his socializing with Ms. V
     outside of work was not acceptable – is false and a pretext for race discrimination
     and/or retaliation.

145. Mr. Hand was held to a higher standard and was disciplined and fired for reasons
     that did not result in discipline or termination of similarly situated white
     managers.

146. In addition, Mr. Hand was treated differently and worse than similarly situated
     white managers who, according to Trader Joe's, lack the necessary leadership

skills to be managers. Those white managers were not terminated; they were demoted to the crew member position.

147.   Within the last year to 18 months, Benjamin B and Shea C, both white, were demoted from Mate to crew for reasons similar to the reason given for terminating Mr. Hand, *i.e.*, lack of confidence in their ability to lead.

148.   There is a history in this country of black male sexuality being weaponized against them and of black men being treated harshly for innocent and innocuous behavior.  In the case of Mr. Hand, there were reports or complaints about him being a promiscuous person who was trying to hook up with white females yet also conducting a secret, monogamous relationship with his ex-girlfriend. None of those things were true. Trader Joe's was influenced by racial stereotypes which painted an inaccurate picture of Mr. Hand and it was those racial stereotypes that led to his termination.

149.   Mr. Hand was a full time Mate making $37.00 per hour ($55.50 for overtime) at the time he was fired.

150.   As a direct and proximate result of Trader Joe's violations of Mr. Hand's rights, he suffered damages including, but not limited to, lost pay and loss of enjoyment of life.

<u>COUNT I: Title VII – Race Discrimination</u>

151.   Paragraphs 1-150 are incorporated by reference.

152.   Defendant's conduct constituted unlawful race discrimination in violation of Title VII.

<u>COUNT II: § 1981 – Race Discrimination</u>

153.    Paragraphs 1-152 are incorporated by reference.

154.    Defendant's conduct constituted unlawful race discrimination in violation of 42

U.S.C. § 1981.

<u>COUNT III: MHRA – Race Discrimination</u>

155.    Paragraphs 1-154 are incorporated by reference.

156.    Defendant's conduct constituted unlawful race discrimination in violation of the

MHRA.

<u>COUNT IV: Title VII – Retaliation</u>

157.    Paragraphs 1-156 are incorporated by reference.

158.    Defendant's conduct constituted unlawful retaliation in violation of Title VII.

<u>COUNT V: § 1981 – Retaliation</u>

159.    Paragraphs 1-158 are incorporated by reference.

160.    Defendant's conduct constituted unlawful retaliation in violation of 42 U.S.C.

§ 1981.

<u>COUNT VI: MHRA – Retaliation</u>

161.    Paragraphs 1-160 are incorporated by reference.

162.    Defendant's conduct constituted unlawful retaliation in violation of the MHRA.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert

with it from continuing to violate his rights;

C.      Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.      Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.      Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award nominal damages;

I.      Award attorney's fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the bases of race or for engaging in protected activity under Title VII, § 1981 and/or the MHRA;

L.      Require  Defendant's CEO to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate race discrimination or retaliation in the future;

M.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendant train all management level employees on the protections afforded by Title VII, § 1981, and the MHRA;

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of race discrimination and retaliation; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.

31

Respectfully submitted,

Dated: May 11, 2020

*/s/* Allan K. Townsend

/s/ Chad T. Hansen

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Allan@EmployeeRightsLaw.Attorney
Chad@EmployeeRightsLaw.Attorney